**HALTER MARINE, INC., Plaintiff,**

v.

**UNITED STATES, Defendant,**

and

**Marinette Marine Corp., Defendant–Intervenor.**

No. 02–105C.

United States Court of Federal Claims.

April 7, 2003 [1].

---

1. This opinion was originally issued and filed under seal on March 7, 2003. The parties were directed to advise the court regarding any portions of the opinion that should be redacted prior to publication. The parties notified the court that the parties agreed that certain portions of the opinion should be redacted. The court agreed, in part, and redacted, the material denot-

ed by the parties. Redactions are indicated by the word REDACTED in brackets.

David S. Bland, King, LeBlanc & Bland, L.L.P., New Orleans, LA, for plaintiff. James Noe, King, LeBlanc & Bland, L.L.P., New Orleans, LA, of counsel.

Patrick J. Mercurio and Thomas Koger, Trial Attorneys, David M. Cohen, Director, and Bryant G. Snee, Assistant Director, United States Department of Justice, Civil Division, Commercial Litigation, Washington, D.C., for defendant. Keith Moore–Erickson, United States Coast Guard, of counsel.

Robert A. Mangrum, Winston & Strawn, Washington, D.C., for defendant-intervenor. Scott A. Schipma, Winston & Strawn, Washington, D.C., of counsel.

## OPINION

HORN, Judge.

The plaintiff, Halter Marine, Inc. (Halter) filed a post-award bid protest complaint seeking to set aside the award of a contract by the United States Coast Guard (Coast Guard) to the defendant-intervenor, Marinette Marine Corporation (Marinette), for a multi-mission Great Lakes Ice Breaker (GLIB). The solicitation for the contract sought the procurement of a multi-purpose vessel that could perform heavy ice breaking missions in the Great Lakes region, service short-range navigational aids, conduct search and rescue missions, provide marine environmental response, and enforce the laws and treaties of the United States in the region.

The plaintiff filed its complaint requesting the court to enjoin the performance of the contract, set aside the award of the contract to Marinette, and direct the award of the contract to Halter. The plaintiff's complaint alleges that the Coast Guard improperly evaluated Marinette's bid, including the Coast Guard's failure to follow the solicitation requirements in the evaluation of the bids, and the Coast Guard's improper use of price as the determinative factor in awarding the contract to Marinette. The plaintiff alleges that as a result of the action by the Coast Guard, the award of the contract to Marinette was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

The defendant and defendant-intervenor filed motions for summary judgment on the administrative record. The defendant claims that the Coast Guard's evaluation and procedures for the award of the GLIB contract "complied with the law in every respect" and that Halter cannot show by "clear and convincing evidence" that it is entitled to permanent injunctive relief. Marinette alleges that, in addition to Halter's failure to establish the elements for injunctive relief, the Coast Guard "conducted a reasonable and rational evaluation" of the proposals. Moreover, defendant-intervenor argues that the Coast Guard's award of the contract was reviewed and validated by the General Accounting Office, for which reason judgment should be entered against Halter on all counts of its complaint.

## FINDINGS OF FACT

Among the responsibilities of the United States Coast Guard is the duty to assist in "keeping open to navigation by means of ice-

breaking operations" the "high seas and waters subject to the jurisdiction of the United States" for the continued, reasonable requirements of maritime commerce. Exec. Order No. 7521, 1 Fed.Reg. 2527 (Dec. 21, 1936); 14 U.S.C. § 2 (2000). In furtherance of this mandate, the Coast Guard is authorized, in conjunction with the Department of Defense, Department of the Navy, and the Commerce Department, to procure the necessary vessels for the ice-breaking operations. Exec. Order No. 7521, 1 Fed.Reg. 2527. The United States Coast Guard Cutter Mackinaw (USCGC Mackinaw), entering approximately its fifty-eighth year of commissioned service in December 2002, currently provides heavy ice-breaking services on the Great Lakes.

The USCGC Mackinaw is a large, single purpose ice-breaking cutter, restricted to the Great Lakes region by the intolerance of the cutter to salt water. The Coast Guard determined in December 2000, that the aging USCGC Mackinaw was "labor intensive to operate and [had] become a significant maintenance liability due to older, less reliable systems." The Coast Guard also found that the USCGC Mackinaw experienced excessive maintenance as a result of the cutter's age and obsolescence and, as consequence, operating costs had increased and reliability had been reduced. According to the Coast Guards findings, "[i]f the MACKINAW is not replaced, unacceptable degradation to heavy icebreaking mission in the Great Lakes will occur."

### The Solicitation

Based on these findings and the scheduled decommission of the USCGC Mackinaw in Fiscal Year 2006, the Commandant of the Coast Guard issued solicitation number DTCG23–01–R–AGL001 on November 21, 2000,[2] to "design, build, outfit, deliver, and provide prescribed levels of follow-on support for a multi-purpose Great Lakes Ice Breaker." The solicitation included a liquidated damages clause that provided that the contractor would be liable in place of actual damages, if performance was not completed within the timeframe specified in the contract, in the amount of $9000.00 per calendar day of delay. In the event the contractor delayed delivery beyond June 30, 2006, an additional $15,000.00 per day would be added to the amount of liquidated damages to cover the direct costs of keeping the USCGC Mackinaw in commission.

The government anticipated the award of a fixed price contract to the responsible offeror whose proposal represented the best value after evaluation in accordance with the factors and subfactors in the solicitation. In order to be eligible for award, the offeror's proposal had to comply in all material respects with the requirements of "law, regulation, and the terms and conditions set forth in the solicitation." The solicitation directed that the Source Selection Authority evaluate the proposals on the following: 1) Technical/Management; 2) Past Performance; and 3) Price. The solicitation specified that "Technical/Management and Past Performance, when combined are more important than Price. Technical/Management is more important than Past Performance. Technical/Management is more important than price." The solicitation further elaborated on the criteria for the determination of the three factors the Source Selection Authority would use to determine the ultimate awardee of the contract.

The solicitation specified that four evaluation factors would be considered, all of equal importance, in evaluating the Technical/Management proposal. The four factors consisted of the following: 1) Program Management; 2) Design and Construction; 3) Integrated Logistics Support; and 4) Technical Expertise. The solicitation detailed

---

2. The administrative record contained the Standard Form 33, solicitation form, which provides the solicitation date of November 21, 2000. The plaintiff's complaint and the defendant-intervenor's motion for summary judgment on the administrative record state that the solicitation date was November 21, 2000. The defendant's statement of facts, the seventeen amendments to the solicitation, and other documents contained in the administrative record indicate the solicitation was issued on December 21, 2000. The court notes that whether the solicitation was issued on November 21, 2000 or December 21, 2000, is not an issue that requires resolution by the defendant's and defendant-intervenor's motion for summary judgment on the administrative record and was not addressed by the parties.

the criteria that would be used in rating the four evaluation factors for the Technical/Management proposal.

For the Past Performance evaluation, the solicitation stated that "[t]he past performance evaluation will be based on the Offeror's Past Performance Questionnaire and information obtained from previous or current customers of the Offeror." The government, however, reserved the right to verify information from other sources. The Past Performance proposal was designed to provide the government with the demonstrated experience and the capability of the offeror to complete the GLIB. The Past Performance evaluation was based on four factors: 1) Overall Customer Satisfaction, 2) Quality of Product, 3) Timeliness of Performance, and 4) Cost Control.

The solicitation required the Price proposal to provide a breakdown of the proposed price for each contract line item as provided for in the solicitation. The Price proposal, however, was not scored or rated, but was to be "evaluated for compliance with solicitation requirements for completeness, cost realism, price reasonableness and Total Evaluated Price."

The solicitation for the GLIB also included a list of attachments to the solicitation, as provided in part three, section J of the solicitation. The first attachment listed in part three, section J was the contract's Performance Specifications. The Performance Specifications of the contract required compliance with certain government specifications, standards, and handbooks published by the Department of Defense, the Coast Guard, the Federal Communications Commission, and the United States Public Health Service. The Performance Specifications also required compliance with non-government published standards, including ship classification rules published by the American Bureau of Ship-

ping and Det Norske Veritas (DNV) Watch1 Rules (July 1998).[3]

DNV Watch1 Rules refers to DNV Rules for Nautical Safety which classifies ships under different degrees of nautical safety in the construction of new vessels with "special equipment and systems." The DNV Rules for Nautical Safety explain that "[t]he main objectives of the Rules for Nautical Safety are to reduce the risk of failures in bridge operation causing collisions, groundings and heavy weather damages and to minimize the consequences to ship and complement should an accident occur." The DNV Rules for Nautical Safety:

[A]im at setting forth requirements to regulate shipboard factors affecting safety and efficiency in bridge operations and, in this context, at [sic]:

— including relevant requirements and recommendations established by the International Maritime Organization (IMO)

— including relevant international standards and specific requirements issued by governmental maritime authorities within the subjects of the Rules or indicating the points in which they differ.

Det Norske Veritas, *Rules for Classification of Ships*, pt. 6, ch. 8, § 1, A202. The DNV Rules for the Classification of Ships explain the class notations as follows:

In order to offer classification to meet the individual needs of shipowners, the Rules for Nautical Safety are divided into three Class Notations. Two Class Notations represent minimum requirements within bridge design, instrumentation and procedures, whereof NAUT–C covers basic bridge design and W1–OC, in addition, includes instrumentation and bridge procedures.

The third Class Notation W1 [Watch1] extends the basic requirements for bridge design and instrumentation and, in addi-

**3.** According to the DNV Rules for Classification of Ships (July 1998), Det Norske Veritas:

[I]s an autonomous and independent Foundation with the object of safeguarding life, property and the environment at sea and ashore. DNV undertakes classification and certification and ensures the quality of ships, mobile offshore units, fixed offshore structures, facilities and systems, and carries out research in connection with these functions. DNV operates a world wide network of survey stations and is authorized by more than 120 national administrations to carry out surveys and, in most cases, issue certificates on their behalf.

Det Norske Veritas, *Rules for Classification of Ships*, pt. 3, ch. 1, § 1, A201 (July 1998).

tion, requires information on the manoeuvring [sic] characteristics of the ship (MAN) and an operational safety manual for safe watchkeeping and command of the ship (OP).

Det Norske Veritas, *Rules for Classification of Ships*, pt. 6, ch. 8, § 1, D101, D102. The DNV Class Notation W1, or Watch1, is the most comprehensive classification under the DNV Rules and incorporates the requirements for NAUT–C and W1–OC, and several other requirements.

The specified DNV Watch1 Rules applied to the contract Performance Specifications 3.1.12, 3.1.12.2, and 3.5.7.1. For example, section 3.1.12 of the Performance Specifications required the offeror to comply with DNV Watch1 Field of Vision requirements. The DNV Watch1 Field of Vision standards required the placement of the bridge[4] above all other decked superstructures, with the ability to observe all objects of interest for navigation from any direction inside the wheelhouse,[5] and various other requirements for the safe operation of the vessel from the bridge, wheelhouse and conning positions.[6]

Similarly, section 3.1.12.2 of the Performance Specifications also necessitated compliance with DNV Watch1 requirements. Section 3.1.12.2, respecting the pilothouse windows, stated in pertinent part, that "[a] clear view through bridge windows shall be provided at all times regardless of weather conditions in accordance with DNV W1 requirements." The DNV Watch1 requirements for the "clear view through windows" provides guidance for shipbuilders regarding the required "clear view." The DNV Watch1 guidelines suggest that the shipbuilder should provide "sunscreens of roller blind type" to ensure a clear view in bright sunshine, "heavy duty wipers and fresh water wash" to ensure a clear view in rain and stormy seas, and the installation of "[e]fficient cleaning, de-icing and de-misting systems."

The solicitation objectives identified by the Coast Guard included the total integration of the GLIB control systems. Section 3.5.7 of the Performance Specifications of the solicitation required the following:

> Integrated Ship Control System (ISCS) for automatic and manual control of the cutter and its machinery systems. The ISCS shall integrate command, control, communications and navigation functions of the bridge with the machinery plant control and monitoring functions of the engine room. The ISCS integration shall include, but not be limited to the following functions: Machinery Plant Control and Monitoring System (MPCMS); Thruster Control and Monitoring; Dynamic Positioning System (DPS) and the Integrated Bridge System (IBS).

Performance Specification section 3.5.7.1, titled "ISCS [Integrated Ship Control System] Performance," stated that "[t]he cutter shall comply with DNV Watch 1 and ABS ACCU."[7]

The Performance Specifications also provided an order of precedence clause, which stated the following:

> In the event of a conflict between the text of this specification and the references cited herein, the text of this specification takes precedence. Nothing in this specification, however, supersedes applicable laws and regulations unless a specific exemption has been obtained.

In addition, the solicitation included "Design and Construction Standards" for the

---

4. The DNV Rules for Classification of Ships define the "bridge" as "[t]he area from which the navigation and control of the ship are exercised, comprising the wheelhouse and the bridge wings." Det Norske Veritas, *Rules for Classification of Ships*, pt. 6, ch. 8, § 1, C102.

5. The DNV Rules for Classification of Ships define the "wheelhouse" as the "[e]nclosed area of the bridge." Det Norske Veritas, *Rules for Classification of Ships*, pt. 6, ch. 8, § 1, C103.

6. The DNV Rules for Classification of Ships define the "conning position" as the "[p]lace on the bridge with a commanding view, providing the necessary information and equipment for a conning officer (pilot) to carry out his functions." Det Norske Veritas, *Rules for Classification of Ships*, pt. 6, ch. 8, § 1, C110.

7. Section 2.2.1 of the solicitation defines ABS ACCU as the American Bureau of Shipping ACCU [Automatic Centralized Control Unmanned] Rules (1998–1999).

GLIB, appended to the Performance Specifications as Attachment A, and modified by Contract Modification No. 0004 on March 13, 2001. The Design and Construction Standards identified "standards, policies, criteria and margins" that were to be applied during the construction of the vessel, if applicable. The Design and Construction Standards stated that the standards were "incorporated into the contract as an exhibit to the Specification, but are not specifications." The contractor's compliance with the Design and Construction Standards was also explained, in Modification 0004, as follows:

The Design and Construction Standards identify statutory requirements as well as classification society rules. In cases where classification society rules or statutory regulations are cited, the GLIB shall be designed and constructed to comply with the cited rule or regulation. This means that equipment required to meet ABS construction certification requirements shall be verified by the contractor to be in compliance to that classification standard (e.g. ABS GRADE A steel, shall have verifications (i.e. mill certificates, etc.) that show at least equivalent compliance with the standard of ABS Grade A). However, the Contractor is not required to obtain Classification Certificates or Certificates of Inspection from ABS.

A pre-solicitation conference was held by the Coast Guard on August 1, 2002 at the Coast Guard Headquarters in Washington, DC. Representatives from Halter and Marinette attended the conference. At the pre-solicitation conference, the Coast Guard explained the need for the Design and Construction Standards, how they were developed and how the standards related to the Performance Specifications and the Statement of Work. The Coast Guard explained the order of precedence for the solicitation as follows: 1) Statement of Work; 2) Performance Specifications; and 3) Design and Construction standards.

In addition to the Performance Specifications, the Statement of Work for the GLIB was listed as the second attachment to the solicitation, in the list of attachments itemized in part three, section J. The Statement of Work established the requirements for the design, construction, testing, and delivery of the GLIB. The requirements of the Statement of Work included, among other items, project management, system engineering, concept design, contract design, and detail design. Section 3.1, on project management, required the contractor to develop an "Integrated Master Plan & Schedule." The Integrated Master Plan & Schedule required the contractor to demonstrate "how program planning and implementation of that planning will manage concurrent and interactive efforts of all program disciplines affecting the ship's design, construction, testing, schedule, delivery, and life cycle costs."

The system engineering requirements section of the Statement of Work called for the design and construction of a GLIB that met all of the requirements identified in the solicitation. As part of the system engineering requirements, the contractor was required to submit a System Engineering Management Plan to "define the contractor's plan for conducting and managing a fully integrated, total program effort." The System Engineering Plan would provide "the contractor's integrated approach for design, ship systems integration, construction, testing, delivery, logistics, and life cycle support planning for the GLIB." The contractor was required to submit the System Engineering Management Plan as part of the contractor's overall Contract Management Data contract line item. Verification that the contractor met all of the solicitation requirements in the construction of the cutter was governed by section 3.2.9 of the Statement of Work. Section 3.2.9.1 explained the general requirements for verification as follows:

The contractor shall demonstrate that the cutter meets all contract requirements. Demonstration/Verification shall occur in two steps. The first step is ensuring that the allocated baseline meets requirements of the performance specification as supplemented by the Design and Construction Standards. Verification of the allocated baseline shall occur through submittal of the Contract Design, Performance Models, Mock-ups, Performance Specification verifications and applicable verifications re-

quired by the Design and Construction Standards (DCS). The second step, final acceptance of the cutter, will be based on Tests and Trials. The contractor shall develop the test plan and procedures for final acceptance based on the detail design of the cutter. Acceptance criteria for Test and Trials will be based on system and equipment performance requirements established in the contract requirements as well as those identified in the Contract Design Specification.

Section 3.2.9.3.1 of the Statement of Work explained that the Performance Specifications verifications and requirements were located in section J, attachment 1, Performance Specifications, as outlined above.

In section 3.2.15, the Statement of Work also delineated the management structure the contractor was required to utilize in the construction of the Integrated Ship Control System, the automatic and manual control system of the GLIB and its machinery systems identified in section 3.5.7 of the Performance Specifications. Section 3.2.15 required the contractor to exercise overall responsibility in the development and utilization of an "Integrated Management Team" for administering the development of the Integrated Ship Control System. The contractor's overall responsibility for the Integrated Management Team required the contractor to ensure that the integration and interface requirements were met for both the Bridge and Engine Room systems, resulting in the delivery of a fully operational and effective Integrated Ship Control System.

The responsibilities of the Integrated Management Team included the oversight of two Single System Integrators. Section 3.2.15 of the Statement of Work required the contractor to select and propose a Single System Integrator responsible for a fully operational, effective Integrated Bridge System, and a second Single System Integrator responsible for a fully operational, effective Integrated Engine Room System. According to the Statement of Work, "the integration functions of the ship controls shall be the shared responsibilities of the SSI–B [Single System Integrator–Bridge] and SSI–ER [Single System Integrator–Engine Room], with the IM [Integration Management] function having overall responsibility to coordinate and approve work."

Section 3.2.15 of the Statement of Work also specified the criteria the contractor should use in the selection of the Single System Integrators:

The Contractor shall select, as SSI–B [Single System Integrator–Bridge], the Integrated Bridge System equipment vendor supplying major Bridge System components for this project. SSI–B must be an organization that has demonstrated successful past performance in the same capacity on design and construction projects utilizing an Integrated Bridge System of equal or greater complexity. Specifically, past performance must demonstrate single system integration experience and responsibilities for the Integrated Bridge requirements of DNV W1.

The Contractor shall select, as SSI–ER [Single System Integrator–Engine Room], the vendor supplying the major components of the Integrated Electric Propulsion System. SSI–ER must be an organization that has demonstrated successful past performance in the same capacity on design and construction projects utilizing an Integrated Electric Plant of equal or greater complexity. Specifically, past performance must demonstrate single system integration experience and responsibilities for a ship design and construction project using a central power system designed to supply power to an electric propulsion system and the ship service power system.

Following the contractor's development of the Integration Management Team and selection of the Single System Integrators, section 3.2.15 of the Statement of Work required the contractor to "provide and implement an ISCS [Integrated Ship Control System] Development Plan." The ISCS Development Plan was one aspect of the contractor's System Engineering Management Plan. The contractor's ISCS Development Plan would describe the contractor's approach to the development and procurement of hardware, firmware, and software for the integration of the ship control system. In addition, the

ISCS Development Plan would detail the "organizational relationships and functional responsibilities necessary to execute the plan."

Section 3.8b of the Statement of Work called for the contractor to provide numerous "Contract Data Requirement Lists," as required under the Contract Construction Data contract line item of the solicitation. As stated in the solicitation, a Contract Data Requirement List "identifies Contractor data development and submission requirements in support of the Great Lakes Icebreaker Capabilities Replacement Project." Pursuant to section 3.8b of the Statement of Work, the contractor was required to submit, in accordance with the Contract Data Requirement List, a "DNV Watch 1 Test Report," a one-time report, with revisions. The Contract Data Requirement List for the DNV Watch1 Test Report specified that the "Report shall document all the results of the tests conducted in accordance with DNV W1 (July 1998) Part 6, chapter 8, section 10. The tests shall be conducted at the Preliminary Acceptance Trials." [8]

The DNV Rules for Classification of Ships (July 1998), Part 6, chapter 8, section 10 (DNV Rules section 10) specified the requirements for a ship's bridge equipment tests. DNV Rules section 10 stated that ships "requesting Class Notation W1–OC or W1 shall comply with the Rules in this Section." DNV Rules section 10 provides the rules for the on-board testing of the ship's bridge equipment. The DNV Rules section 10 general requirements state the following:

> After installation of equipment in ships requesting Class Notation W1–OC or W1, on-board testing of the equipment shall be performed in order to ascertain that the equipment, as installed, operates satisfactory.
>
> It should be noted that reliable figures for all aspects of equipment performance/accuracy cannot be established by the on-board testing required for classification. Therefore, to ensure that equipment

performance is in accordance with specifications, shipowners are advised to choose equipment that is type approved by Det Norske Veritas.

Det Norske Veritas, *Rules for Classification of Ships*, pt. 6, ch. 8, § 10, B101–B102. For Watch1 classification, the DNV Rules section 10 requires the submittal of a testing program for approval by DNV. DNV Rules section 10 specifies that the testing program should be in accordance with the requirements for on-board testing of various components of the bridge equipment. For example, DNV Rules section 10 required testing of the "gyro compass," "automatic steering system," "rudder indicators," "echo sounder," and the "electronic position-fixing systems." Det Norske Veritas, *Rules for Classification of Ships*, pt. 6, ch. 8, § 1, B400, B500, B600, B900, B1200.

Two offerors timely responded to the solicitation for the design and construction of the GLIB, Halter and Marinette.

### Halter Marine's Bid Proposal

On May 30, 2001, Halter submitted its Technical/Management proposal to the Commandant of the Coast Guard. The proposal stated that the "successful completion of the Great Lakes Icebreaker (GLIB) design and construction program will be achieved through the coordinated effort of the best team of managers, designers and builders with the demonstrated ability to meet program requirements on time and within budget." As the prime contractor for the design and construction of the GLIB, Halter proposed to assume the responsibility for overall contract performance to ensure compliance with all of the solicitation requirements. Halter's Technical/Management proposal identified an Integrated Ship Control Systems Coordinator to supervise the Single System Integrators in the development of the Integrated Ship Control System.

Halter selected Seacoast Electronics, Inc. (Seacoast) as the Single System Integrator

---

8. The Preliminary Acceptance Trials for the GLIB was an aspect of the contractor's Integrated Verification Plan under Section 3.2.9.2 of the solicitation. The contractor's Integrated Verification Plan provided the time sequence for the component, subsystem, and system level tests.

The tests included a Preliminary Acceptance Trial, which verified numerous aspects of the GLIB's performance. For example, full power ahead, sustained speed, full power astern, crash stop ahead, maneuvering, the mooring system, and the Integrated Bridge System.

for the Integrated Bridge System. Halter's Technical/Management proposal stated that Seacoast would utilize bridge equipment manufactured by Litton Marine Systems. The proposal also stated that Litton Marine Systems was "the only supplier of integrated bridge systems to receive DNV approval for Watch–1 (One–Man Bridge) operations." Halter selected ABB Industry Oy as its Single System Integrator for the Engine Room System.

Halter's Price proposal was submitted to the Commandant of the Coast Guard on June 13, 2001. The Coast Guard scheduled Halter's oral presentation for the GLIB for June 21, 2001 in Arlington, Virginia.

### Marinette Marine's Bid

Marinette submitted its Technical/Management proposal to the Commandant of the Coast Guard on May 30, 2001. The proposal stated that the Marinette "offers an optimum solution to the USCG's Great Lakes Icebreaker needs." Marinette's bid addressed the Coast Guard requirement for an Integrated Ship Control System. In this regard, Marinette's bid provided the following:

> MMC [Marinette] is very confident of our ability to function as the integration manager on the GLIB. We have the experience and expertise to perform this task. MMC will ensure that our chosen single source integrators for the engine room and bridge also have the experience and expertise to do the task and that they fully understand the requirements.

Recognizing the solicitation requirements, Marinette based its selection of the Single System Integrator for the Integrated Bridge System on the equipment, communications network, and communications interfaces proposed for use in the GLIB construction. Marinette selected Kongsberg Simrad as the Single System Integrator for the Integrated Bridge System. The proposal stated that Kongsberg Simrad would provide design, engineering, and integration relative to the role as the Single System Integrator for the Integrated Bridge System. Marinette selected ABB Industry Oy for its Single System Integrator for the Engine Room System.

On June 12, 2001, Marinette submitted its Price proposal. The Coast Guard scheduled Marinette's oral presentation of its contract bid for June 20, 2001 in Arlington, Virginia.

### Bid Evaluation, Contract Award, Post–Award Debriefing & GAO Bid Protest

The Administrative Record includes the Source Evaluation Board's Final Report (Final Report), dated October 3, 2001. The Final Report explained that the upon completing the initial evaluation, the Source Evaluation Board determined that both offerors possessed excellent Past Performance, but neither of the proposals demonstrated a clear superiority on the basis of the Technical/Management evaluation. The Source Evaluation Board recommended, and the contracting officer concurred, a competitive range of two. Written and verbal discussions were held with both offerors, and following those discussions, final revised proposal were received from both offerors on September 10, 2001. Halter's proposal price was $103,694,113.00. Marinette's proposal price was $84,575,913.00, and the Coast Guard's evaluated most probable cost to the government for Marinette's proposal was $87,630,128.00. Marinette's proposed price of $84,575,913.00 was $19,118,200.00 less than Halter's proposed price and the Coast Guard's evaluated most probable cost of Marinette's proposal was $16,063,985.00 less than Halter's proposed price.

By memorandum dated October 10, 2001, Robert S. Horowitz, the Source Selection Authority, issued a decision regarding the GLIB acquisition. The Source Selection Authority's determination stated the following:

> The rationale for my decision is that this proposal MAIZE [Marinette] is the lowest Total Evaluated Price. The two proposals are essentially equivalent in both Technical/Management and Past Performance. The Small Disadvantage Business Participation Plan is acceptable as submitted. This proposal is not a clearly superior technical proposal. Overall, this proposal is the most advantageous proposal to the Coast Guard.
>
> My decision is based upon the RFP, which specifies that the basis for contract award would be based on the proposal

which is "most advantageous to the Government in terms of the established evaluation factors. The source Selection Authority will determine which proposal is most advantageous to the Government." Based upon my assessment of all proposals in each area with the specified criteria, it is my decision that the proposal MAIZE is most advantageous to the Government, price and other factors considered. I direct that contract award be made to the firm that submitted Proposal MAIZE.

The Coast Guard Contracting Officer, Carl E. McGill, notified Marinette of the award of the contract on October 16, 2001. Halter Marine was notified that it would not be awarded the contract on October 15, 2001.

By letter dated October 17, 2001, the Coast Guard notified Halter of the requested post-award debriefing to be held at the Coast Guard Headquarters in Washington, D.C. The Administrative Record of the GLIB procurement included the Coast Guard documents used in the debriefing. The debriefing for the Technical/Management aspects of Halter's proposal reflect the Source Selection Authority's findings that Halter's and Marinette's proposals were essentially equivalent. The debriefing documents also included the cost evaluations for the two proposals. The cost evaluation debriefing documents state that Marinette "presented a much more mature design and cost estimate with several estimating cycles completed," which resulted in "detailed identification and application of commonality with existing projects in processes and material purchases," "large use of actual equipment/subcontractor bid costs vice cost estimating relationships with margins," and "strong and focused vendor negotiations."

On December 12, 2001, the United States General Accounting Office (GAO) issued a decision denying Halter's protest to the GAO of the award of the contract to Marinette. The GAO decision denied the protest.

## DISCUSSION

### Motion for Summary Judgment on the Administrative Record

The defendant and the defendant-intervenor have filed a motion for summary judg-

ment on the administrative record pursuant to Rule 56.1 of the Rules of the Court of Federal Claims (RCFC). RCFC 56.1(a) dictates that such motions are reviewed under the same standards as are motions for summary judgment under RCFC 56(a). *See Rust Constructors Inc. v. United States,* 49 Fed.Cl. 490, 493 (2001); *World Travel Serv. v. United States,* 49 Fed.Cl. 431, 438 (2001); *Nickerson v. United States,* 35 Fed.Cl. 581, 588 (1996), *aff'd,* 113 F.3d 1255, 1997 WL 177509 (Fed.Cir.1997) (table). RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Telemac Cellular Corp. v. Topp Telecom, Inc.,* 247 F.3d 1316, 1323 (Fed.Cir.), *reh'g denied and reh'g en banc denied* (2001); *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d 1253, 1257 (Fed.Cir.2001); *Avenal v. United States,* 100 F.3d 933, 936 (Fed.Cir. 1996), *reh'g denied* (1997); *Creppel v. United States,* 41 F.3d 627, 630–31 (Fed.Cir.1994). A fact is material if it will make a difference in the result of a case under the governing law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48, 106 S.Ct. 2505; *see also Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d at 1257; *Curtis v. United States,* 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied,* 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959), *reh'g denied,* 361 U.S. 941, 80 S.Ct. 375, 4 L.Ed.2d 361 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine

whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Ford Motor Co. v. United States*, 157 F.3d 849, 854 (Fed.Cir. 1998) (the nature of a summary judgment proceeding is such that the trial judge does not make findings of fact); *Johnson v. United States*, 49 Fed.Cl. 648, 651 (2001), *aff'd*, 52 Fed.Appx. 507 (Fed.Cir.2002); *Becho, Inc. v. United States*, 47 Fed.Cl. 595, 599 (2000). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. 2505; *Jay v. Sec'y of Dep't of Health and Human Servs.*, 998 F.2d 979, 982 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1993). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1553 n. 3 (Fed.Cir.1996). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Summary judgment:

> saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

*Dehne v. United States*, 23 Cl.Ct. 606, 614–15 (1991) (citing *Pure Gold, Inc. v. Syntex, Inc.*, 739 F.2d 624, 626 (Fed.Cir.1984)), *vacated on other grounds*, 970 F.2d 890 (Fed.Cir.1992); *United States Steel Corp. v. Vasco Metals Corp.*, 55 C.C.P.A. 1141, 394 F.2d 1009, 1011 (C.C.P.A.1968).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505; *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 971 (Fed.Cir.2001), *cert. denied*, 534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002); *Gen. Elec. Co. v. Nintendo Co.*, 179 F.3d 1350, 1353 (Fed.Cir. 1999). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. at 587–88, 106 S.Ct. 1348; *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d at 1257; *Wanlass v. Fedders Corp.*, 145 F.3d 1461, 1463 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1998).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Trilogy Communications, Inc. v. Times Fiber Communications, Inc.*, 109 F.3d 739, 741 (Fed.Cir.) (quoting *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1575 (Fed.Cir.1994), *reh'g denied and en banc suggestion declined* (1995)), *reh'g denied and en banc suggestion declined* (1997); *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1569 (Fed.Cir.1997). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. 2548; *Am. Airlines v. United States*, 204 F.3d 1103, 1108 (Fed. Cir.2000); *see also Schoell v. Regal Marine Indus., Inc.*, 247 F.3d 1202, 1207 (Fed.Cir. 2001).

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not

accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the non-moving party must go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case. *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987)); *Chevron USA, Inc. v. Cayetano,* 224 F.3d 1030, 1037 n. 5 (9th Cir. 2000), *cert. denied,* 532 U.S. 942, 121 S.Ct. 1403, 149 L.Ed.2d 346 (2001). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.,* 401 F.2d 689, 692 (4th Cir.1968), *cert. denied,* 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also B.F. Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d 587, 593 (6th Cir.2001); *Massey v. Del Labs., Inc.,* 118 F.3d 1568, 1573 (Fed.Cir.1997). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other necessarily is justified. · *B.F. Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d at 593; *Atl. Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1148 (10th Cir.2000); *Allstate Ins. Co. v. Occidental Int'l, Inc.,* 140 F.3d 1, 2 (1st Cir. 1998); *Reading & Bates Corp. v. United States,* 40 Fed.Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration. . *DeMarini Sports, Inc. v. Worth, Inc.,* 239 F.3d 1314, 1322 (Fed.Cir. 2001); *Gart v. Logitech, Inc.,* 254 F.3d 1334, 1338–39 (Fed.Cir.2001), *cert. denied,* 534 U.S. 1114, 122 S.Ct. 921, 151 L.Ed.2d 886 (2002).

After reviewing the parties' submissions, the court finds that there are no material facts in dispute.

**Standard of Review**

The plaintiff has filed a protest requesting the court to issue a permanent injunction directing the Coast Guard to re-evaluate the proposals of Halter and Marinette to permit correction of the alleged errors committed by the agency in the original evaluation process. The plaintiff seeks a new award based upon such re-evaluation to the plaintiff.

The Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996), amended the Tucker Act and also provided the United States Court of Federal Claims with post-award bid protest jurisdiction for actions filed on or after December 31, 1996. *See* 28 U.S.C. § 1491(b)(1)-(4) (2000). The statute provides that post-award protests of agency procurement decisions are to be reviewed under the Administrative Procedure Act (APA) standards, making the standards outlined in *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970) and the line of cases following that decision applicable. *See Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (2003); *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332 (Fed.Cir. 2001).

Agency procurement actions, therefore, should be set aside when they are determined to be "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "(D) without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D) (2000); *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332; *RAMCOR Servs. Group, Inc. v. United States,* 185 F.3d 1286, 1290 (Fed.Cir.1999).

In *Impresa Construzioni Geom. Domenico Garufi v. United States,* the court wrote:

Under the APA standards that are applied in the *Scanwell* line of cases, a bid award may be set aside if either: (1)[T]he procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or proce-

dure.... When a challenge is brought on the first ground, the courts have recognized that contracting officers are "entitled to exercise discretion upon a broad range of issues confronting them" in the procurement process. *Latecoere Int'l, Inc. v. United States Dep't of Navy,* 19 F.3d 1342, 1356 (11th Cir.1994). Accordingly, the test for reviewing courts is to determine whether "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion," *id.,* and the "disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" *Saratoga Dev. Corp. v. United States,* 21 F.3d 445, 456 (D.C.Cir. 1994). When a challenge is brought on the second ground, the disappointed bidder must show "a clear and prejudicial violation of applicable statutes or regulations." *Kentron [Hawaii, Ltd. v. Warner,]* 480 F.2d [1166,] 1169 [(D.C.Cir.1973)]; *Latecoere,* 19 F.3d at 1356.

*Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332–33 (certain citations omitted); *see also OMV Med., Inc. v. United States,* 219 F.3d 1337, 1343 (Fed.Cir.2000).

A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. *See Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 995–96 (Fed.Cir.1996); *Wilner v. United States,* 24 F.3d 1397, 1413 (Fed.Cir.1994) (dissenting on other grounds); *Labat–Anderson Inc. v. United States,* 50 Fed.Cl. 99, 106 (2001), *aff'd* 264 F.3d 1071 (Fed.Cir.); *Emery Worldwide Airlines, Inc. v. United States,* 49 Fed.Cl. 211, 222 (2001); *Dynacs Eng'g Co. v. United States,* 48 Fed.Cl. 614, 619 (2001); *Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. 388, 392 (1999). The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> [I]f the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so

implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). "The agency must present a full and reasoned explanation of its decision .... The reviewing court is thus enabled to perform a meaningful review ...." *In re Sang–Su Lee,* 277 F.3d 1338, 1342 (Fed.Cir.2002).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. at 43, 103 S.Ct. 2856. "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed.Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971)); *see also Cybertech Group, Inc. v. United States,* 48 Fed.Cl. 638, 646 (2001). As stated by the United States Supreme Court:

> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citations omitted); *see also Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), *reh'g denied,* 420 U.S. 956, 95 S.Ct. 1340, 43 L.Ed.2d

433 (1975); *In re Sang–Su Lee*, 277 F.3d at 1342; *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed.Cir. 2000) ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.") (citing *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. at 285, 95 S.Ct. 438); *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 959 (Fed. Cir.1993); *ManTech Telecomms. and Info. Sys. Corp. v. United States*, 49 Fed.Cl. at 63; *Ellsworth Assocs., Inc. v. United States*, 45 Fed.Cl. at 392 ("Courts must give great deference to agency procurement decisions and will not lightly overturn them.") (citing *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985)); *Redland Genstar, Inc. v. United States*, 39 Fed.Cl. 220, 231 (1997); *Mike Hooks, Inc. v. United States*, 39 Fed.Cl. 147, 154 (1997); *Cincom Sys., Inc. v. United States*, 37 Fed.Cl. 663, 672 (1997); *Commercial Energies, Inc. v. United States*, 20 Cl. Ct. 140, 145 (1990) ("In simple terms, courts should not substitute their judgments for pre-award procurement decisions unless the agency clearly acted irrationally or unreasonably.") (citations omitted).

Similarly, in *E.W. Bliss Co. v. United States*, the United States Court of Appeals for the Federal Circuit offered guidance on the applicable standard of review:

Procurement officials have substantial discretion to determine which proposal represents the best value for the government. *See Lockheed Missiles & Space Co., Inc. v. Bentsen*, 4 F.3d 955, 958 (Fed.Cir.1993); *cf. Widnall v. B3H*, 75 F.3d 1577 (Fed. Cir.1996) (holding that Board of Contract Appeals should defer to agency's best value decision as long as it is "grounded in reason ... even if the Board itself might have chosen a different bidder"); *In re General Offshore Corp.*, B–251969.5, B–251969.6, 94–1 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) ¶ 248, at 3 [1994 WL 129008] (Apr. 8, 1994) ("In a negotiated procurement, any proposal that fails to conform to material terms and conditions of the solicitation

should be considered unacceptable and may not form the basis for an award. Where an evaluation is challenged, we will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion.") (citations omitted). Bliss has not shown that the Mint abused its discretion in awarding the contract to Pressmasters.

\* \* \* \* \* \*

Bliss' [other challenges to the procurement] deal with the minutiae of the procurement process in such matters as technical ratings ... which involve discretionary determinations of procurement officials that a court will not second guess. *See Lockheed Missiles & Space Co.*, 4 F.3d at 958; *Grumman Data Systems Corp. v. Widnall*, 15 F.3d 1044, 1048 (Fed.Cir.1994) ("[S]mall errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement."); ...

*E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed.Cir.1996); *see also JWK Int'l Corp. v. United States*, 49 Fed.Cl. 371, 388 (2001), *aff'd* 279 F.3d 985 (Fed.Cir.2002).

In a negotiated procurement, in which contracting officers are generally afforded even greater decision making discretion, in comparison to their role in sealed bid procurements. "It is well-established that contracting officials are accorded broad discretion in conducting a negotiated procurement ...." *Hayes Int'l Corp. v. United States*, 7 Cl.Ct. 681, 686 (1985) (citing *Sperry Flight Sys. v. United States*, 212 Ct.Cl. 329, 339–340, 548 F.2d 915 (1977)); *see also Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d at 958; *Cybertech Group, Inc. v. United States*, 48 Fed. Cl. at 646 ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."); *CACI Field Servs., Inc. v. United States*, 13 Cl.Ct. 718, 726 (1987), *aff'd*, 854 F.2d 464 (Fed.Cir. 1988). In *Burroughs Corp. v. United States*, the court described the broad discretion af-

forded a contracting officer in a negotiated procurement as follows:

> Remarking on the contracting officer's discretion in negotiation the court in *Sperry Flight Systems Division v. United States,* 212 Ct.Cl. 329, 339, 548 F.2d 915, 921 (1977) noted that "... the decision to contract—a responsibility that rests with the contracting officer alone—is inherently a judgmental process which cannot accommodate itself to absolutes, at least not without severely impairing the quality of the judgment called for ..." and that, "effective contracting demands broad discretion." Because of the breadth of discretion given to the contracting officer in negotiated procurement, the burden of showing this discretion was abused, and that the action was "arbitrary and capricious" is certainly much heavier than it would be in a case of formal advertising.

*Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 65, 617 F.2d 590, 598 (1980) (citation omitted; omissions in original); *see also La-Barge Prods., Inc. v. West,* 46 F.3d 1547, 1555 (Fed.Cir.1995); *JWK Int'l Corp. v. United States,* 49 Fed.Cl. at 388; *ManTech Telecomms. and Info. Sys. Corp. v. United States,* 49 Fed.Cl. at 64.

The United States Court of Appeals for the Federal Circuit has stated that:

> Effective contracting demands broad discretion. *Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 617 F.2d 590, 598 (1980); *Sperry Flight Sys. Div. v. United States,* 548 F.2d 915, 921, 212 Ct.Cl. 329 (1977); *see NKF Eng'g, Inc. v. United States,* 805 F.2d 372, 377 (Fed.Cir.1986); *Tidewater Management Servs., Inc. v. United States,* 573 F.2d 65, 73, 216 Ct.Cl. 69 (1978); *RADVA Corp. v. United States,* 17 Cl.Ct. 812, 819 (1989), *aff'd,* 914 F.2d 271[, 1990 WL 122139] (Fed.Cir.1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." *Tidewater Management Servs.,* 573 F.2d at 73, 216 Ct.Cl. 69....

*Lockheed Missiles & Space Co., Inc. v. Bentsen,* 4 F.3d at 958–59; *Grumman Data Sys. Corp. v. Dalton,* 88 F.3d at 995; *see also*

*Grumman Data Sys. Corp. v. Widnall,* 15 F.3d 1044, 1046 (Fed.Cir.1994).

The wide discretion afforded contracting officers extends to a broad range of procurement functions, including the determination of what constitutes an advantage over other proposals. As stated by the United States Supreme Court:

> Particularly when we consider a purely factual question within the area of competence of an administrative agency created by Congress, and when resolution of that question depends on "engineering and scientific" considerations, we recognize the relevant agency's technical expertise and experience, and defer to its analysis unless it is without substantial basis in fact.

*Fed. Power Comm'n v. Florida Power & Light Co.,* 404 U.S. 453, 463, 92 S.Ct. 637, 30 L.Ed.2d 600, *reh'g denied,* 405 U.S. 948, 92 S.Ct. 929, 30 L.Ed.2d 819 (1972); *see also Compubahn v. United States,* 33 Fed.Cl. 677, 682–83 (1995) ("[T]his court is in no position to challenge the technical merit of any comments made on the evaluation sheets or decisions made during the several stages of evaluation.") (footnote omitted); *Electro–Methods, Inc. v. United States,* 7 Cl.Ct. 755, 762 (1985) (Especially "where an agency's decisions are highly technical in nature ... judicial restraint is appropriate and proper.") (citations omitted). *But cf. Cybertech Group, Inc. v. United States,* 48 Fed.Cl at 646 (Although acknowledging that the agency's decision is entitled to a presumption of regularity, stating "[t]he court must, however, perform a thorough review of even technical decisions in order to meaningfully exercise its jurisdiction.") (citing *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 910–11 (Fed.Cir.1988)). As noted above, the question is not whether the court would reach the same conclusions as the agency regarding the comparison of proposals, but rather, whether the conclusions reached by the agency lacked a reasonable basis, and, thus, were arbitrary and capricious.

To prevail in a bid protest case, the protester also must demonstrate prejudice. 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error"). Expanding on

the prejudice requirement, the United States Court of Appeals for the Federal Circuit has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. *See Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed.Cir.1996); *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." *Data General*, 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." *Statistica*, 102 F.3d at 1582; *see CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1574–75 (Fed.Cir.1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, " 'there was a substantial chance that [it] would receive an award—that it was within the zone of active consideration.' ") (citation omitted).

*Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed.Cir.), *reh'g denied* (1999) (citation omitted in original); *see also Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed.Cir. 2002); *OMV Med., Inc. v. United States*, 219 F.3d at 1342; *Advanced Data Concepts, Inc. v. United States*, 216 F.3d at 1057; *Stratos Mobile Networks USA, LLC v. United States*, 213 F.3d 1375, 1380 (Fed.Cir.2000). In *Data General Corporation v. Johnson*, the Circuit Court wrote:

> We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract.... The standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances.

*Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996).

In the present case, the defendant and defendant-intervenor request the court to grant summary judgment on the administrative record against the plaintiff on all counts in the complaint. The plaintiff's complaint appears to identify the following five issues regarding the award of the contract to Marinette that serve as the basis for the requested injunctive, declaratory, and other relief: 1) Marinette's contract bid was non-responsive regarding the solicitation requirements for the Single System Integrator for the Bridge System, and as a result of the Coast Guard's award of the contract to Marinette, "the Coast Guard violated the law and materially altered [the] terms of the Solicitation;" 2) Marinette's bid was non-responsive regarding the solicitation requirements for the Single System Integrator for the Engine Room System, and when the Coast Guard's "accepted Marinette's proposal as responsive, the Coast Guard violated the law and materially altered [the] terms of the Solicitation;" 3) the Coast Guard's evaluation of Halter's Technical/Management Proposal was "arbitrary and capricious;" 4) the Coast Guard acted arbitrarily and capriciously in the determination of the Past Performance factors in Halter and Marinette's bid; and 5) the Coast Guard's "evaluation of Marinette's price as realistic and reasonable in light of the difference between the price and its own estimate, and in light of the non-responsiveness of Marinette's proposal, was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law and regulation."

## Single System Integrator for the Bridge System

 The plaintiff's complaint states that the Coast Guard "violated the law and materially altered [the] terms of the Solicitation" when it accepted Marinette's bid which plaintiff alleges could not obtain DNV Watch1 certification. According to the plaintiff, the solicitation required the potential bidder to select as the Single System Integrator for the Bridge System the vendor which supplied the major components of the Bridge System.

The plaintiff alleges that because Marinette selected Kongsberg Simrad as the major components vendor, and ultimately the Single System Integrator for the Bridge System, the defendant-intervenor failed to comply with the terms of the solicitation and the Coast Guard's award of the contract to Marinette was improper.

The plaintiff asserts that in order for the GLIB proposed by Marinette to be DNV Watch1 certified as required by Performance Specification section 3.5.7.1 of the solicitation, the major components of the Bridge System must be "type approved" by Det Norske Veritas. As the vendor of the major components of the Bridge System and ultimately the Single System Integrator of the Bridge System, the plaintiff alleges that "[t]wo of the three components of the bridge system that Kongsberg Simrad manufactures and supplies are *not* DNV 'type approved.' The bridge system proposed by Marinette *cannot be DNV W1 compliant* without *all three* components being 'type approved.'" (Emphasis in original). Therefore, according to the plaintiff, the "GLIB proposed by Marinette does not comply with DNV W1 as specifically required by the Performance Specifications of the Solicitation. The Coast Guard should have deemed Marinette's proposal non-responsive. The Coast Guard lacked a rational basis for deeming Marinette's proposal responsive."

The defendant and defendant-intervenor assert that summary judgment on the administrative record is appropriate regarding the claim by the plaintiff that Marinette's bid was non-responsive regarding the Single System Integrator for the Bridge System based on the clear language of the solicitation. The defendant and defendant-intervenor assert that the solicitation does not require the vendor of the major components of the Bridge System to supply components that are "type approved," and, therefore, Marinette's bid proposing Kongsberg Simrad as the vendor for the major components of the Bridge System and as the Single System Integrator for the Bridge System complied with the terms of the solicitation.

The United States Court of Appeals for the Federal Circuit stated in *Jowett, Inc. v. United States* that:

> In interpreting a contract, we begin with the plain language. We give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning. In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense.

*Jowett, Inc. v. United States,* 234 F.3d 1365, 1368 (Fed.Cir.2000) (citations omitted); *see also Hunt Constr. Group, Inc. v. United States,* 281 F.3d 1369, 1372 (2002) ("We begin with the plain language when interpreting a contract.... The contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts.") (citations omitted); *Giove v. Dep't of Transp.,* 230 F.3d 1333, 1340–41 (2000) ("In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense. Further, business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs.") (citations omitted).

As found above, section 3.2.15 of the Statement of Work of the solicitation required the contractor to select and propose a Single System Integrator responsible for a fully operational, effective Integrated Bridge System. Section 3.2.15 of the Statement of Work specified the criteria the contractor should use in the selection of the Single System Integrator for the Bridge System:

> The Contractor shall select, as SSI–B [Single System Integrator-Bridge], the Integrated Bridge System equipment vendor supplying major Bridge System components for this project. SSI–B must be an organization that has demonstrated successful past performance in the same capacity on design and construction projects utilizing an Integrated Bridge System of equal or greater complexity. Specifically, past performance must demonstrate single system integration experience and responsibilities for the Integrated Bridge requirements of DNV W1.

Pursuant to section 3.8b of the Statement of Work, the contractor was required to submit, in accordance with the Contract Data Requirement List, a "DNV Watch1 Test Report." The Contract Data Requirement List for the DNV Watch1 Test Report specified that the "[r]eport shall document all the results of the tests conducted in accordance with DNV W1 (July 1998) Part 6, chapter 8, section 10. The tests shall be conducted at the Preliminary Acceptance Trials."

DNV Rules section 10 specifies the rules and requirements for the on-board testing the ship's Bridge System. DNV Rules section 10 states that ships "requesting Class Notation W1–OC or W1 shall comply with the Rules in this Section." Det Norske Veritas, *Rules for Classification of Ships,* pt. 6, ch. 8, § 10, A101. The DNV Rules section 10 general requirements state the following:

> After installation of equipment in ships requesting Class Notation W1–OC or W1, on-board testing of the equipment shall be performed in order to ascertain that the equipment, as installed, operates satisfactory.

> It should be noted that reliable figures for all aspects of equipment performance/accuracy cannot be established by the on-board testing required for classification.

> Therefore, to ensure that equipment performance is in accordance with specifications, shipowners are advised to choose equipment that is type approved by Det Norske Veritas.

Det Norske Veritas, *Rules for Classification of Ships,* pt. 6, ch. 8, § 10, B101–B102.

Although section 3.2.15 of the Statement of Work specified the criteria the contractor should use in the selection of the vendor for the major components of the Bridge System to insure compliance with DNV Watch 1, section 3.2.15 does not require the selected Single System Integrator for the Bridge System to supply "type approved" components of the Bridge System, only that the equipment which is supplied can meet the requirements of DNV Watch1. Moreover, the Contract Data Requirement List for the DNV Watch1 Test Report does not specify "type approved" Bridge System components, but only requires a DNV Watch1 Test Report.

To obtain a complaint DNV Watch1 Test Report, the potential awardee of the contract was required to comply with the DNV Rules section 10. DNV Rules section 10 does not require the shipowner seeking DNV Watch 1 approval to select ship components that are "type approved," but states that shipowners are "advised to choose equipment that is type approved by Det Norske Veritas." Det Norske Veritas, *Rules for Classification of Ships,* pt. 6, ch. 8, § 10, B102. Whether Marinette will ultimately be able to successfully obtain a compliant DNV Watch1 Test Report upon delivery of the GLIB pursuant to DNV Rules section 10, as required by section 3.8b of the Statement of Work, is a question that will be addressed by the Coast Guard's contracting officer in the final acceptance of Marinette's GLIB and is not an issue appropriate for review by this court. The record before the court, however, does not lead to a conclusion that a complaint DNV Watch1 Test Report cannot be obtained using the equipment to be incorporated in the design of the GLIB.

**Single System Integrator for the Engine Room System**

The plaintiff alleges in its complaint that the solicitation required that a potential bidder choose the Single System Integrator for the Engine Room System and required certain functional responsibilities to be performed by the Single System Integrator for the Engine Room System. The plaintiff asserts that both Halter and Marinette received subcontract bids from and selected ABB Industry Oy as the Single System Integrator for the Engine Room System. According to the plaintiff, however, Marinette's bid was non-responsive because it did not conform to the Scope of Work requirements of the solicitation. The plaintiff alleges:

> However, Halter has been informed by ABB that its bid price offered to Marinette was lower than the bid price offered Halter because Marinette requested a bid to perform fewer functional responsibilities than did Halter. Marinette's proposal fails to comply with the material requirements of the Solicitation because it undertakes to have its selected engine room system integrator perform fewer than the required

functional responsibilities and its proposal should have been deemed non-responsive by the Coast Guard.

The plaintiff's complaint states that as a result of the Coast Guard's acceptance of Marinette's bid proposal, the Coast Guard altered the material terms of the solicitation. The plaintiff contends that the alleged alteration of the material terms of the contract by the Coast Guard prejudiced Halter because Halter bid the contract assuming that the Single System Integrator for the Engine Room System would assume all functional responsibilities. As a result, the plaintiff alleges that, "Halter not only incurred increased bid preparation costs, but also proposed a price that was higher than it would be if it had been permitted to propose a engine room system integrator who would assume fewer than all functional responsibilities."

The defendant-intervenor's motion for summary judgment on the administrative record asserts that, following discussions with the Coast Guard, Marinette amended its initial proposal for the GLIB before the award, and the amended, final proposal provided that ABB Industry Oy would be performing all of the approximately fifteen functional responsibilities required by section 3.2.15 of the solicitation for the Single System Integrator for the Engine Room System. The defendant-intervenor states that:

> As a result, there is simply no support in the record for Halter's wholly speculative claim that Marinette proposed to have its SSI–ER [Single System Integrator for the Engine Room System] perform fewer functions than those identified in the Solicitation. In fact, the record contains an express indication that Marinette's proposed SSI–ER would perform all of the functions identified in the Solicitation.

▮▮▮ The United States Court of Appeals for the Federal Circuit has stated that "[i]n negotiated procurements, a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations." *E.W. Bliss Co. v. United States,* 77 F.3d at 448 (citations omitted). However, "where, in a negotiated procurement, an offeror's proposal does not comply with the solicitation's requirements, an agency is not required to eliminate the awardee from the competition, but may permit it to correct its proposal." *ManTech Telecomms. & Info. Sys. Corp. v. United States,* 49 Fed.Cl. at 71. As noted above, section 3.2.15 of the Statement of Work specified the criteria the contractor should use in the selection of the Single System Integrator for the Engine Room System:

> The Contractor shall select, as SSI–ER [Single System Integrator–Engine Room], the vendor supplying major components of the Integrated Electric Propulsion System. SSI–ER must be an organization that has demonstrated successful past performance in the same capacity on design and construction projects utilizing an Integrated Electric Plant of equal or greater complexity. Specifically, past performance must demonstrate single system integration experience and responsibilities for a ship design and construction project using a central power system designed to supply power to an electric propulsion system and the ship service power system.

Section 3.2.15 of the Statement of Work also designates the functional responsibilities of the Single System Integrator for the Engine Room System in an attachment labeled Table 3. The solicitation stated that the Single System Integrator for the Engine Room System was responsible for the functional responsibilities identified in Table 3, which included over fifteen separate functions for the integration of Engine Room equipment and systems. In addition, section 3.2.15 provided an additional attachment labeled Table 5, which identified five typical Engine Room System components, broken down to more than thirty-five subpart components. Section 3.2.15, stated that the Engine Room System components identified in Table 5 were "[t]ypical Engine Room System components" which the Single System Integrator for the Engine Room System was required to interface and integrate.

The Administrative Record of the GLIB procurement details the discussions the

**164**

Coast Guard had with the potential bidders, Marinette and Halter, following the submittal of their initial proposals and the Coast Guard's competitive range determination. On July 18, 2001, the Coast Guard's contracting officer sent a letter to Halter regarding the plaintiff's bid proposal. Among other issues discussed in the July 18, 2001 letter to the plaintiff, the Coast Guard stated the following:

The offeror's proposal does not demonstrate how the proposed SSI–ER [Single System Integrator for the Engine Room System] meets the requirement for being the supplier of the major components of the Integrated Electric Propulsion System as per SOW [Statement of Work] 3.2.15. Nor does the proposal explain the consortium agreement between TANO and ABB as it relates to the SSI–ER requirements.

On July 31, 2001, the Coast Guard's contracting officer further explained Halter's proposal deficiencies regarding the Single System Integrator for the Engine Room System and stated:

It is not clear from your interim response that the proposed SSI–ER will meet this requirement. Our intent in this requirement was not to restrict the SSI–ER to only equipment that the SSI–ER manufactures, but to restrict the process in order to impose some consistency in the design and equipment selection process, in addition to all the SSI–ER functional responsibilities identified in SOW Table 3.

On August 7, 2001, Halter received and forwarded to the Coast Guard a letter from ABB Industry Oy, which stated that "ABB will now assume the responsibility of SSI–ER [Single System Integrator for the Engine Room System]." The August 7, 2001 correspondence detailed the responsibilities that ABB Industry Oy would undertake as the Single System Integrator for the Engine Room System, which included all of the approximately fifteen functions listed in Table 3 of section 3.2.15 of the Statement of Work. In addition, the August 7, 2001 correspondence provided a replication of Table 5 for section 3.2.15 of the Statement of Work, which showed ABB Industry Oy, Halter, and another subcontractor supplying the more than thirty-five subpart components of the five typical Engine Room System components, for which ABB Industry Oy, as the Single System Integrator for the Engine Room System, had responsibility for integration and interfacing. Halter's final proposal with revisions, submitted to the Coast Guard on September 10, 2001, reflected ABB Industry Oy's new role as Single System Integrator for the Engine Room System.

On July 31, 2001, the Coast Guard's contracting officer sent a similar letter to Marinette regarding the defendant-intervenor's selection of the Single System Integrator for the Engine Room System, and with regard to the "design and equipment selection process" and the "functional responsibilities identified in SOW Table 3." In response, Marinette forwarded a letter from ABB Industry Oy dated August 7, 2001, to the Coast Guard. The August 7, 2001 letter detailed ABB Industry Oy's assumption of the responsibility as the Single System Integrator for the Engine Room System for Marinette. In addition, the August 7, 2001 letter provided that as the Single System Integrator for the Engine Room System, ABB Industry Oy would undertake all the functional responsibilities listed in Table 3 of section 3.2.15 of the Statement of Work. The August 7, 2001 correspondence also provided a replication of Table 5 for section 3.2.15 of the Statement of Work, which showed ABB Industry Oy, Marinette, and another subcontractor supplying the more than thirty-five subpart components of the five typical Engine Room System components, for which ABB Industry Oy, as the Single System Integrator for the Engine Room System, had responsibility for integration and interfacing. On September 10, 2001, Marinette submitted its final proposal with revisions for the GLIB and designated ABB Industry Oy as Single System Integrator for the Engine Room System.

The solicitation required the bidder's Single System Integrator for the Engine Room System to supply the major components of the Engine Room System and carry-out the functional responsibilities of section 3.2.15, Table 3 of the Statement of Work. The plaintiff has challenged the Coast Guard's acceptance of Marinette's bid on the basis that the

Single System Integrator for the Engine Room System would not perform the functional responsibilities identified in the solicitation. However, the Administrative Record is clear, following discussions held by the Coast Guard, Marinette's revised proposal designated ABB Industry Oy as the Single System Integrator for the Engine Room System, and ABB Industry Oy specifically assumed the functional responsibilities identified in section 3.2.15, Table 3.

In its opposition to the defendant's and the defendant-intervenor's motion for summary judgment on the administrative record, the plaintiff alleges that Marinette's bid was non-responsive because Marinette proposed that it would undertake the requirement to supply the "motor setup switchgear," which, as Halter contends, was a functional responsibility required to be performed by the Single System Integrator for the Engine Room System. The solicitation, however, reads that the "motor setup switchgear" was a component the solicitation stated was "[t]ypical Engine Room System components for which SSI–ER [Single System Integrator for the Engine Room System] has responsibility to integrate and interface [as] identified in Table 5 [of section 3.2.15]" and is not a "functional responsibility." Additionally, the correspondence between Halter and the Coast Guard, and Marinette and the Coast Guard, concerning each bidder's initial proposals indicate that the functional responsibilities were identified and listed in Table 3. The "motor setup switchgear" is listed in Table 5, which was a "typical" system for integration and interfacing. Moreover, Halter's submission of the August 7, 2001 correspondence from ABB Industry Oy, which assumed the responsibility of the Single System Integrator for the Engine Room System, stated that a subcontractor of ABB Industry Oy would be supplying the "motor setup switchgear." It is clear from the Administrative Record that Halter and Marinette read section 3.2.15 as requiring the Single System Integrator for the Engine Room System to assume the functional responsibilities of section 3.2.15, Table 3, and the assumption of the responsibility of interface and integration of section 3.2.15, Table 5, but not as requiring furnishing all of the thirty-five subpart components of section 3.2.15, Table 5. The plaintiff's contention that Marinette's bid was non-responsive regarding the functional responsibilities of its Single System Integrator for the Engine Room System is without merit.

### Evaluation of Halter's Technical/Management Proposal

■ The plaintiff's complaint alleges that the Coast Guard improperly evaluated the Technical/Management area of the bidders' proposals. According to the plaintiff, the Coast Guard inappropriately assigned to Halter a "satisfactory" rating for the "Demonstrated Corporate Experience and Capability" element of the Integrated Logistic Support (ILS) factor, one of the four factors of the Technical/Management area, while Marinette received a "superior" rating. The plaintiff asserts that Halter received a "satisfactory" rating:

> [D]espite the fact that the Coast Guard identified no weaknesses or deficiencies with Halter's ILS [Integrated Logistic Support] proposal and specifically found that the risk of adverse impact to quality and the extent of government oversight required were reduced because of Halter's selection of Quantic Engineering, Inc. ("Quantic") to fulfill the ILS requirements.... There is no rational basis for assigning Halter a meager "satisfactory" rating for the ILS factor and assigning Marinette a "superior" rating when both ratings were based on past and/or future utilization of the same subcontractor, Quantic.

The defendant and defendant-intervenor assert that summary judgment in their favor on the administrative record is appropriate because there is support for the Coast Guard's assignment of a superior rating under the Demonstrated Corporate Experience and Capability element of the ILS factor due to Marinette's in-house experience and capability. The plaintiff, in its opposition to the defendant's and defendant-intervenor's motion for summary judgment on the administrative record did not address the defendant and defendant-intervenor's assertion regarding the Technical/Management evaluation claim.

The solicitation for the GLIB specified the evaluation factors for award and specifically addressed the Technical/Management evaluation as follows:

a. Each proposal will be evaluated to assess the Offeror's ability to design and construct a Great Lakes Icebreaker (GLIB), and, ultimately, to test and deliver a GLIB in accordance with the Government requirements. The Offeror's proposal must convey to the Government that the Offeror has a suitable approach, the required resources, and possesses sufficient technical expertise and experience to manage resources and effectively achieve all requirements.

b. The Technical/Management Evaluation factors will be as follows and all are of equal importance:

(1) Program Management factor

(2) Design & Construction factor

(3) Integrated Logistics Support (ILS) factor

(4) Technical Expertise factor

c. Program Management, Design, and ILS factors will be evaluated based on the following criteria: (1) Soundness of Approach and (2) Demonstrated Corporate Experience and Capability. The Technical Expertise factor will be evaluated based on the following criteria: (1). Relevancy and (2) Depth. The evaluation will identify strengths, weaknesses and deficiencies. Each of the Technical/Management Evaluation factors will be assigned a rating and an assessment of the level of risk associated with each of the criteria.

The Administrative Record contains an evaluation worksheet for the rating of Halter's proposed Integrated Logistics Support element of the Technical/Management area. The Halter worksheet evaluated the Demonstrated Corporate Experience and Capability criteria and was dated September 27, 2001. Under the narrative portion of the Halter worksheet, the evaluation included the following:

The offeror demonstrated their experience and capability to successfully complete the ILS objectives of the GLIB through their Past Projects Forms. Their application of the ILS elements (maintenance planning, supply support, training, etc.) was adequately demonstrated on several projects. There was no [sic] strengths, weaknesses, significant weaknesses or deficiencies noted for this factor/criteria. Therefore the offeror received a rating of Satisfactory for Integrated Logistics Support, Demonstrated Corporate Experience and Capability.

The Administrative Record also contains an evaluation worksheet for the rating of Marinette's proposed Integrated Logistics Support element of the Technical/Management area. The worksheet evaluated the Demonstrated Corporate Experience and Capability criteria and was similarly dated September 27, 2001. The narrative portion of the Marinette worksheet provided the following:

The offeror has clearly demonstrated the experience and capability to successfully complete the ILS objectives of the GLIB contract, such as an integrated logistics support system with great reliability, as documented in numerous Past Projects Forms. Their in-house ILS team has significant, current experience with CG [Coast Guard] provisioning processes, ensuring timely implementation of the supply support effort and increasing the accuracy of the information. For example, offeror has demonstrated a 99% accuracy rate with bin validity tests, ensuring vessels sail properly spared, reducing operational down time due to Mean Logistics Delay Time (MLDT). In addition, the ILS manager is accustomed to working with the design engineers to ensure the integration of life-cycle cost estimating and other ILS concerns into the design. Therefore the offeror received a rating of Superior for Integrated Logistics Support, Demonstrated Corporate Experience and Capability.

As the evaluation worksheets for the Demonstrated Corporate Experience and Capability of the ILS factor for Halter and Marinette demonstrate, the Coast Guard had, and articulated, a rational basis for distinguishing between Halter and Marinette. While the summary prepared for Halter indicates that there were no significant weakness or defi-

ciencies noted, it also states that the were no. strengths identified either.

By contrast, the comments contained in the Coast Guard's summary of Marinette's Demonstrated Corporate Experience and Capability for ILS provide contains specific, significant, and relevant examples of Marinette's superior ILS performance on recent Coast Guard projects. These noted examples constitute a rational basis to support the "superior" rating assigned to Marinette for this factor, as well as the disparity between this rating and the one assigned to Halter. Because the Administrative Record supports the Coast Guard's decision in this regard, judgment upon the administrative record in favor of the defendant and defendant-intervenor is appropriate with respect to this claim.

### Evaluation of Past Performance

The plaintiff alleges in its complaint that the Coast Guard did not follow the procedures for the evaluation of the Past Performance of offerors as required in the solicitation. The complaint asserts that in evaluating Past Performance, the solicitation provided four factors the Coast Guard would consider, which included a "Quality of Project factor." According to the plaintiff, the evaluation of the four factors that comprised Past Performance was based on information obtained from questionnaires directed at the offeror's past or current customers. The complaint asserts that the Coast Guard's evaluation of the Quality of Project factor of Past Performance was improperly assessed because:

> Although the Solicitation provides that the Quality of Project factor is comprised of six sub-factors, the Past Performance Questionnaire instructed the offeror's customers to evaluate only four of those sub-factors. Omitted from the Questionnaire were the sub-factors of management responsiveness and the offeror's past conduct in standing by its warranty.

The plaintiff also alleges that Marinette should not have received an "excellent" rating for Past Performance due to alleged deficiencies with Marinette's construction of previous vessels for the Coast Guard. The plaintiff states that "Marinette has recently built two classes of ships for the Coast Guard, the WLB and the WLM. There are serious documented problems with several of these vessels, suggesting that Marinette's Past Performance evaluations are greatly inflated."

In addition, Halter alleged in the complaint that because Marinette received a "good" rating for one of the evaluation factors of Past Performance, Marinette should not have received an overall rating of "excellent" for Past Performance. The complaint states that Halter received "excellent" ratings for the four factors of Past Performance, while Marinette received three "excellent" ratings and one "good" rating, yet in the final evaluation, both Halter and Marinette received "excellent" summaries for Past Performance. The plaintiff asserts that based on the Coast Guard's alleged omissions in the questionnaires, the assignment of the "excellent" overall rating for Past Performance to Marinette, and Marinette's alleged problems with previous Coast Guard procurements, Halter "has been subjected to fundamental unfairness in the evaluation process."

The defendant's motion for summary judgment on the administrative record claims that the Coast Guard's Past Performance evaluation was "even-handed and reasonable." The defendant asserts that the solicitation identified the individual four factors for Past Performance, but did not provide formal subfactors, and, therefore, the questionnaires used by the Coast Guard were in compliance with the solicitation. The defendant also states that the Coast Guard's Past Performance rating of Marinette and Halter as "excellent" was reasonable and rational. Additionally, according to the defendant, Halter's claim that the Marinette encountered problems on previous Coast Guard ship contracts is not supported by the record and is without factual support. The defendant-intervenor has raised similar arguments in support of its motion for summary judgment on the administrative record. The defendant-intervenor asserts that the questionnaire regarding Past Performance complied with the solicitation, Marinette's rating as "excellent" was a reasonable determination within the discretion of the agency, and Marinette's Past Performance under previous

Coast Guard contract's was properly considered by the agency.

The court notes that "[a]n agency is accorded broad discretion when conducting its past performance evaluations." *Computer Sciences Corp. v. United States,* 51 Fed.Cl. 297, 319 (2002). Thus, for example, "an agency, in evaluating past performance, can give more weight to one contract over another if it is more relevant to an offeror's future performance on the solicited contract." *Forestry Surveys & Data v. United States,* 44 Fed.Cl. 493, 499 (1999). "In light of this, various decisions hold that, in protests challenging an agency's evaluations of an offeror's technical proposal and past performance, review should be limited to determining whether the evaluation was reasonable, consistent with the stated evaluation criteria and complied with relevant statutory and regulatory requirements." *JWK Int'l Corp. v. United States,* 52 Fed.Cl. 650, 659 (2002), *aff'd* 56 Fed.Appx. 474, 2003 WL 344100 (Fed.Cir. Feb.12, 2003).

The solicitation stated the following regarding the evaluation of Past Performance:

a. Assessment of the Offeror's past performance will be one means of evaluating the credibility of the Offeror's proposal, and relative capability to meet performance requirements. The past performance evaluation will be based on the Offeror's Past Performance Questionnaire and information obtained from previous or current customers of the Offeror. Review of past performance will not be limited to the information provided in the questionnaire submitted by the Offeror. The Government may verify information from other sources and on other contracts, not listed in the questionnaire, performed by the Offeror.

b. Evaluation of past performance will be subjective based on consideration of all relevant past performance information obtained by the Government. It will include a determination of the Offeror's commitment to customer satisfaction and will include conclusions of informed judgment.

c. The Past Performance Evaluation will be based on the following four factors:

• Overall Customer Satisfaction—Would the customer select this firm again? Yes/ No.

• Quality of Product—Compliance with contract requirements, accuracy of reports, technical excellence, management responsiveness, appropriateness of personnel, and stood behind warranty.

• Timeliness of Performance—Met interim milestones, reliable, completed on time, including wrap-up and contract administration.

• Cost Control—Delivered within budget, provided current and accurate/complete billings, and relationship of negotiated costs to actuals.

| PAST PERFORMANCE FACTORS | Overall Rating |
| --- | --- |
| Overall Customer Satisfaction | Yes/No |
| Quality of Project | Rating |
| Timeliness of Performance | Rating |
| Cost Control | Rating |

Overall Customer Satisfaction is essentially equal in weight to the other three factors combined. Offerors with no records of past performance will be evaluated as neutral in the past performance evaluation.

Included in the solicitation was a Past Performance questionnaire which instructed past and current customers to rate the offeror's performance based on the four factors identified above. The questionnaire included instructions for the offeror's customer when completing out the form. The questionnaire instructed the customer to "[s]ummarize contractor performance in each of the rating areas [the four Past Performance factors]. Assign each area a rating of 0 (Unsatisfactory), 1 (Poor), 2 (Fair), 3 (Good) or 4 (Excellent). Use the following instructions as guidance in making these evaluations." The questionnaire proceeded to list four "bullet points" under three of the four Past Performance factors, Quality of Product, Cost Control, and Timeliness of Performance. Overall Customer Satisfaction was not included, presumably because the questionnaire called for a Yes/No response. However, the questionnaire did state in another section: "Overall Customer Satisfaction: Would you select this firm again? Please explain," and provided

and area for the customer to provide comments.

Agencies must evaluate proposals and make awards based on the criteria stated in the solicitation. This requirement is clear and rooted in the Competition in Contracting Act and the Federal Acquisition Regulations. *See* 10 U.S.C. § 2305(b)(1) (2000) ("The head of an agency shall evaluate sealed bids and competitive proposals and make an award based solely on the factors specified in the solicitation."); 48 C.F.R. § 15.305(a) (2001) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation.").

The plaintiff has alleged in its complaint that the questionnaire did not comply with the solicitation because the questionnaire's instructions to customers did not include "management responsiveness" and "stood behind warranty" as "bullet points" for the Quality of Product factor considerations. The plaintiff, however, received a copy of the questionnaire prior to submitting its bid and any deficiency identified regarding the questionnaire in the solicitation should have been brought before Halter submitted its bid to the Coast Guard. *See N.C. Div. Of Servs. For the Blind v. United States,* 53 Fed.Cl. 147, 165 (2002) ("The court reaches this determination by virtue of the analogy of this case to the line of cases where this court, in appropriate circumstances, has adopted the General Accounting Office (GAO) bid protest rule that protests based upon alleged improprieties in a solicitation which are apparent prior to bid opening or the time set for receipt of initial proposals shall be filed prior to bid opening or the time set for receipt of proposals."); *Novell, Inc. v. United States,* 46 Fed.Cl. 601, 615 (2000) ("Offerors may challenge the terms of the solicitation, but only prior to submission of final proposals."); *DSD Labs., Inc. v. United States,* 46 Fed.Cl. 467, 479 (2000) (noting that the bidder had a duty to inquire regarding an ambiguous term in the solicitation prior to submission of final bids); *Aerolease Long Beach v. United States,* 31 Fed.Cl. 342, 358 (1994), *aff'd* 39 F.3d 1198, 1994 WL 572795 (Fed.Cir.) ("If an offeror recognizes an ambiguity or other problem in the solicitation, proper procedure dictates that the offeror challenge the problem before submission of an offer."); *see also Beacon Constr. Co. of Mass. v. United States,* 161 Ct.Cl. 1, 6–7, 314 F.2d 501, 504 (1963). Because the plaintiff did not raise the alleged discrepancies between the evaluation factors of Past Performance and the questionnaires prior to the submission of its bid, the defendant and defendant's motion for summary judgment on the administrative record regarding this claim is granted.

The court also notes that the questionnaires that former or current customers were asked to execute on behalf of the offeror were not inconsistent with the evaluation factors identified in the solicitation. The solicitation stated that Past Performance would be evaluated on the basis of four factors, Quality of Product, Cost Control, Timeliness of Performance, and Overall Customer Satisfaction. Although the solicitation listed examples of what the Coast Guard found relevant to the four factors, i.e., compliance with contract requirements, accuracy of reports, technical excellence, management responsiveness, appropriateness of personnel, and stood behind warranty, the solicitation did not state that an offeror's Past Performance would be based only on these examples, and in fact the solicitation indicated that other information would be considered. The questionnaire provided with the solicitation, as the plaintiff correctly pointed out, only listed compliance with contract requirements, accuracy of reports, technical excellence, and appropriateness of personnel as "bullet points" under the Quality of Product factor, yet the questionnaire states that the "bullet points" were to be used as "instructions as guidance in making [the] evaluations." In addition, the questionnaire also included additional "bullet points" under the Cost Control and Timeliness of Performance factors in the questionnaire that were not provided as examples in the solicitation's list of factors. The "bullet points" in the questionnaire which a former or current customer of an offeror was instructed to use as "guidance" were not "subfactors" the Coast Guard would use in the evaluation of Past Performance, but merely descriptive words that were intended to aid

in "guidance" for the execution of the questionnaire, and their addition or omission was not determinative in the evaluation. The Coast Guard did not violate the terms of the solicitation with the use of the questionnaires received as part of the solicitation package.

■ The plaintiff's allegation that the Coast Guard improperly awarded the contract to Marinette because the defendant-intervenor received an overall "excellent" rating for Past Performance but only received three "excellent" ratings for Cost Control, Timeliness of Performance, and Overall Customer Satisfaction and one "good" rating for Quality of Product factor is not substantiated. The Administrative Record for the procurement of the GLIB contains approximately eighty individual worksheets used by the Source Selection Authority to compile information obtained from previous or current customers of the offerors. The worksheets evidence the efforts used by the Source Selection Authority to determine the offerors' Past Performance, which the solicitation stated would be "subjective based on consideration of all relevant past performance information obtained by the Government. It will include a determination of the Offeror's commitment to customer satisfaction and will include conclusions of informed judgment." *See In re Opti–Lite Optical*, 99–1 C.P.D. ¶ 61, at 4, 1999 WL 152145 (Comp. Gen.1999) ("While adjectival ratings and point scores are useful as guides to decision-making, they generally are not controlling, but rather, must be supported by documentation of the relative differences between proposals, their strengths, weaknesses and risks, and the basis and reasons for the selection decision."); *In re Teltara*, 98–2 C.P.D. ¶ 124, at 4, 1998 WL 841469 (Comp.Gen.1998); *In re Biospherics Inc.*, 98–2 C.P.D. ¶ 96, at 4, 1998 WL 729187 (Comp. Gen 1998); *In re Century Envtl. Hygiene, Inc.*, 98–1 C.P.D. ¶ 164, at 4, 1998 WL 312129 (Comp.Gen. 1998). The court finds that the Source Selection Authority did not act arbitrarily or capriciously when it utilized its "informed judgment" to determine that Marinette should receive an overall rating of "excellent" for Past Performance. The solicitation's emphasis on the Overall Customer Satisfaction factor, on which Marinette received a rating of

"excellent," and which was equal in weight to the other three factors, Cost Control, Timeliness of Performance, and Quality of Product, combined, further supports the Coast Guard's evaluation. Under these circumstances, and in light of the discretion normally afforded an agency in evaluating Past Performance, the Coast Guard's decision to rate both offerors as "excellent" was rational. *See Forestry Surveys & Data v. United States*, 44 Fed.Cl. at 499 ("[A]n agency, in evaluating past performance, can give more weight to one contract over another if it is more relevant to an offeror's future performance on the solicited contract.").

Halter's final claim regarding the Coast Guard's evaluation of the offerors' Past Performance is that Marinette should not have received an "excellent" rating for Past Performance due to alleged deficiencies with Marinette's construction of previous vessels for the Coast Guard. As stated above, the plaintiff alleges that "Marinette has recently built two classes of ships for the Coast Guard, the WLB and the WLM. There are serious documented problems with several of these vessels, suggesting that Marinette's Past Performance evaluations are greatly inflated." The plaintiff's response to the defendant's and defendant-intervenor's motion for summary judgment does not address this claim and other than the statements in the plaintiff's complaint, Halter has not offered further support for these allegations. The Administrative Record, however, does address the plaintiff's claim of "documented problems" with the WLB and WLM ships constructed by Marinette for the Coast Guard, and provides a review of the Past Performance of Marinette for the WLM and WLB contracts. For the Overall Customer Satisfaction factor, the Coast Guard was satisfied with Marinette's performance for both the WLB and WLM contracts and indicated that it would use Marinette on future contracts. For the Quality of Product, Timeliness of Performance, and Cost Control factors, Marinette received "excellent" ratings for the WLB and WLM contracts. Based on the Source Selection Authority's investigation and evaluation of Marinette's Past Performance of previous Coast Guard contracts for

the WLB and WLM ships, the court does not find that the defendant erred in awarding an "excellent" rating to Marinette for Past Performance based on the WLB and WLM Coast Guard contracts.

### Evaluation of the Price Proposals

■ The plaintiff's complaint also states that the Coast Guard's overall evaluation of the proposals for the GLIB was improper and alleges that the Coast Guard awarded the contract to Marinette solely based on Marinette's lower price (approximately $20 million less) for the construction of the GLIB. The plaintiff alleges that when the Coast Guard evaluated the proposals, price became the "determinative factor" in the award of the contract, as evidenced by the Coast Guard's failure to properly apply the evaluation criteria contained in the solicitation. The plaintiff also alleges that the Coast Guard's determination that Marinette's price was realistic and reasonable was improper and lacked a rational basis. The plaintiff asserts that:

It is undisputed that MMC [Marinette] submitted a proposal with a price that was approximately $19 million[9] less than the price submitted on Halter's proposal. The Solicitation established the evaluation scheme where Price was the least important area. AR 302. The most important area of evaluation is Technical/Management and the second most important area is Past Performance. AR 302. The Solicitation clearly requires that the CG [Coast Guard] review the proposal for compliance with the Solicitation requirements and permits award of the contract only to offerors that conform to the Solicitation. AR 302. In order to capture a false economy of MMC's lower price, the CG overlooked non-responsiveness of MMC's proposal. Contrary to the Solicitation, CG made Price more important than the other areas.

The plaintiff's complaint further provides that "Marinette's price is undervalued due to its failure to comply with material requirements of the Solicitation in connection with the bridge and engine room systems of the

GLIB." As found above, however, this allegation is without merit because Marinette's proposal complied with and bid on each of the required elements of the solicitation regarding the Bridge and Engine Room Systems.

Regarding cost realism and relative importance of the price proposal, the solicitation provided the following procedures for price evaluation:

a. Proposals will not be scored or rated. They will be evaluated for compliance with solicitation requirements for completeness, cost realism, price reasonableness and Total Evaluated Price.

(1) Completeness is an accurate reflection, within the price proposal, of all aspects of the technical proposal and demonstrates compliance with the price proposal instructions in Section L and any other applicable directions. Failure to address significant portions of the technical proposal in the price proposal may constitute an incomplete price submission that could result in a rejection of the proposal.

(2) Cost realism means that the costs in an offeror's proposal are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the various elements of an offeror's technical proposal. The Government reserves the right to impute adjustments (either increases or decreases) to an offeror's proposed amounts for CLINs 0006 and 1006, "Construction of GLIB," and CLINs 0010 and 2010, "OBRP, AEL, GUCL", if it determines that the proposed amounts are not the most probable, final costs that the Government would be likely to incur if an offeror is awarded the contract.

(3) Price reasonableness will be determined by comparing an offeror's propsed [sic] price to the Independent Government Cost Estimate and other offeror's proposals. . . .

The Administrative Record for the procurement of the GLIB provides the Coast

---

9. In its complaint, plaintiff also states "Marinette's proposed price was approximately $20 million less than the price proposed by Halter."

Guard's evaluation of the offerors' price proposals and documents the agency's determination that Marinette's bid was reasonable and realistic. "In order to overturn a cost realism decision [a] plaintiff must demonstrate that the choice made by the agency was irrational." *JWK Int'l Corp. v. United States,* 49 Fed.Cl. at 393 (citation omitted). The United States Court of Federal Claims addressed price proposal determinations as follows:

> In general, "contracting officers are vested with wide discretion with regard to the evaluation of bids." *Labat–Anderson, Inc. v. United States,* 42 Fed.Cl. 806, 846 (1999). "Decisions on cost realism are within the agency's sound discretion and expertise, and the judgment will not be overturned absent any rational basis." Steven W. Feldman, *Government Contract Awards* § 11:16 n. 8 (1998) (citing *Halifax Technical Serv., Inc. v. United States,* 848 F.Supp. 240 (D.D.C.1994)). "Reflecting this broad discretion, plaintiff has an unusually heavy burden of proof in showing that the [acceptability] determination ... was arbitrary and capricious." *Id.* (internal quotation marks and citations omitted). "Plaintiff's burden is to demonstrate that the agency's determination lacked a reasonable basis." *Labat–Anderson[, Inc. v. United States],* 42 Fed.Cl. at 846.

*CTA Inc. v. United States,* 44 Fed.Cl. 684, 693 (1999).

> Moreover, in order to be rational it is not necessary to demonstrate that the cost realism analysis was performed with "impeccable rigor." *OMV Med., Inc. v. United States,* 219 F.3d 1337, 1344 (Fed.Cir. 2000). Rather, the analysis must reflect that the agency took into account the information available and did not make irrational assumptions or critical miscalculations.

*JWK Int'l Corp. v. United States,* 49 Fed.Cl. at 393.

The Administrative Record contains the Coast Guard's Cost Evaluation Team Final Report (CET Report), issued September 28, 2001. The CET Report's price comparison analyzed the total price offered by Halter, $103,694,113.00, and Marinette, $83,804,254.00, to the Independent Government Cost Estimate of $114,031,000.00. Among other determinations, the CET Report found "[b]oth Offeror's cost proposals to be complete," "[b]oth Offeror's prices to be realistic," and "[b]oth Offeror's prices to be reasonable in comparison to each other and the IGCE [Independent Government Cost Estimate]." The CET Report examined the offeror's design and project management hours, construction hours, material costs, construction CLIN costs, and design and logistics costs. The CET Report found that Marinette's construction CLIN costs "represents the significant cost discriminator" between Halter's and Marinette's proposed cost for the construction of the GLIB.

The CET Report stated the following regarding Marinette's construction CLIN costs:

> The CET [Cost Evaluation Team] is concerned that Offeror Maize [Marinette] construction CLIN costs are artificially low. Offeror Maize attributes this to strong teaming and negotiated prices with its subcontractors and has provided subcontractor/material bids for supporting data. However, recognizing Maize's reliance on commonality with past projects as a primary cost savings, the CET's professional judgment is that, if awarded, Offeror Maize's cost would reach the ceiling price of the contract. Thus, as presented in Section M of the RFP, the CET presents Offeror Maize's ceiling price as a Most Probable Cost to the Government.... Again, the construction CLIN represents the significant cost discriminator.

The CET Report provided an in-depth review of Marinette's Price proposal and provided an analysis which reflected the agency's consideration of the available information, rational assumptions, and critical calculations:

> The remaining CLIN 0006, addresses actual construction of GLIB. Offeror Maize's [Marinette's] proposed price for CLIN 0006 is $58,037,462 in comparison to the IGCE's [Independent Government Cost Estimate's] of $84,156,000. In response to CET [Cost Evaluation Team] concerns that Offeror Maize prices are artificially low raised in discussions, the Offeror pro-

vided costing narratives on labor and materials, a full bill of material and labor breakdowns. While most categories were lower than the IGCE, no one area showed an obvious disparity identifying a particular cost not to be considered realistic. While Offeror Maize overall construction price is below the IGCE's probable range, the following factors are of consideration:

1. [REDACTED]

2. The IGCE was developed on the assumption of GLIB as a lead ship and one build. In comparison, the Offeror presents several systems, which can be viewed as follow-on to previous and existing projects. This is consistent in that costs for SWBS [REDACTED] are higher than the IGCE, where all three SWBS areas represent a departure from existing projects and would need to be viewed as a lead ship. Further, costs for SWSB [REDACTED] are proportionally lower than the IGCE. It is these latter SWBS where learning curves, economy of scale, and commonality would be transferable to GLIB if applicable. If SWBS [REDACTED] were to be viewed in this frame, their costs are realistic and fall near the curve of a later ship in a production run of 10 or more.

3. The Offeror's narrative and bill of materials presents that the Offeror has completed several costing spirals resulting in a mature estimate, where they have identified approximately $12,000,000 in saving through vendor negotiations, actual bid vice estimated costs, and commonality purchases.

4. The Offeror's labor hours are roughly equivalent to the other Offeror's hours, representing price reasonableness.

In design and logistic CLIN's, Offeror Maize prices are realistic based on the level of effort required and reasonable based on the IGCE and the other Offeror's prices. Offeror Maize appears to have a full understanding of the contract requirements. In construction, Offeror Maize constructions [sic] costs are below the IGCE's expected range; however, the cost appears to be realistic based on the above considerations.

The portions of the Coast Guard's price analysis quoted above specifically addressed a variety of reasons and circumstances which explained why Marinette's price was below the Independent Government Cost Estimate. Moreover, even though the Coast Guard concluded that these reasons "defended, in large part" Marinette's proposed price, the Coast Guard attempted to further insure that the prices of the proposals submitted were fairly compared by imputing an upward adjustment of $3,054,215.00 to Marinette's $84,575,913.00 proposed price. As a result, the Coast Guard assigned Marinette's proposal an overall Most Probable Cost of $87,630,128.00, under the solicitation procedures for the evaluation of the offerors' Price proposals. Based on Coast Guard's analysis of Marinette's Price proposal and the upward adjustment of Marinette's bid, the court does not find that the Coast Guard acted arbitrarily, capriciously, or lacked a reasonable basis in determining Marinette's Price proposal to be reasonable.

The plaintiff's final claim alleges that the offerors' Price proposals became the "determinative factor" in the award of the contract to Marinette. The solicitation provided that award of the contract would "be based on those proposals which are most advantageous to the Government in terms of the established evaluation factors. The Source Selection Authority will determine which proposal is most advantageous to the Government.". As found above, the solicitation provided that for purposes of bid evaluations, "Technical/Management and Past Performance, when combined are more important than Price. Technical/Management is more important than Past Performance. Technical/Management is more important than price." The solicitation stated that the Technical/Management evaluation factors were of equal importance and included: 1) Program Management Factor; 2) Design & Construction factor; 3) Integrated Logistics Support factor; and 4) Technical Expertise factor.

■ The Technical/Management and Past Performance Final Evaluation Report (Final Report) in the Administrative Record provided the summary ratings of the Technical/Management aspects of Halter's and

Marinette's proposals. The Final Report indicated that Halter received a "Superior" rating for "Demonstrated Corporate Experience" for the Design and Construction factor and Marinette received a rating of "Superior" for "Soundness of Approach" under the Program Management factor, yet as the solicitation provided, the factors under the Technical/Management evaluation were weighted equally. In addition, Halter and Marinette each received one risk of "Medium" under "Soundness of Approach" for the Design and Construction factor, however, the factors were of equal importance. The remaining factors and subfactors to the offeror's bids were rated equally by the Final Report. As found above, both offeror's Past Performance evaluations were found to be "Excellent." The Coast Guard, therefore, was faced with two offerors' with Technical/Management proposals which were rated equal, Past Performance proposals which were rated equal, and the remaining evaluation factor of Price with a difference in the amount of $16,063.985.00, using the Coast Guard's Most Probable Price assigned to Marinette. The court, finding the Coast Guard's evaluation of Marinette's price proposal to be rational and reasonable, does not find the award of the GLIB contract to Marinette to be improper.

### CONCLUSION

For the foregoing reasons, the plaintiff's motion for permanent injunctive relief is **DENIED**. The defendant's and the defendant-intervenor's motion for judgment on the administrative record is **GRANTED**. The Clerk of the Court is directed to enter judgment in favor of the defendant and the defendant-intervenor.

**IT IS SO ORDERED.**

